## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

UNITED STATES OF AMERICA, *ex rel*:
CYNTHIA WALKER, and JACQUELINE D.
HOLLINS and CYNTHIA WALKER, and
JACQUELINE D. HOLLINS , Individually          **PLAINTIFFS**

V.                                    CIVIL ACTION NO.: **3:18-cv-21-NBB-RP**

MTM, INC., CEDRIC SORRELS,
SORRELS TRANSPORTATION, INC.,
GLORIA LONG, and
TANAKA KNIGHT                                 **DEFENDANTS**

## FIRST AMENDED COMPLAINT FOR DAMAGES
## AND OTHER RELIEF
## UNDER THE FALSE CLAIMS ACT

## FILED UNDER SEAL—PROCESS TO BE WHTHELD UNTIL FURTHER
## ORDER OF THE COURT

## JURY TRIAL DEMANDED

Plaintiff, United States of America, *ex rel*: Cynthia Walker and Jacqueline

D. Hollins as Relators and individually, by and through counsel, and respectfully

state as follows:

### THE ACTION IN A NUTSHELL

1.      This is an action brought by Plaintiffs, the United States of America

(United States or Government), by and through the Relators, Cynthia Walker

(Ms. Walker) and Jacqueline Hollins (Ms. Hollins) to recover treble damages and

civil penalties under the False Claims Act 31 U.S.C. §§3729 – 3733 (FCA) from

defendants MTM, Inc. (MTM), Cedric Sorrels, doing business as Sorrels

Transportation, Inc., (Mr. Sorrels or STC) Gloria Long, (Ms. Long), and Tanaka

Knight (Ms. Knight) and for damages for retaliation under 31 U.S.C. §3730(h)(1) & (2), for back pay, interest on back pay, and other compensation, including special damages sustained by the individual plaintiffs, including attorneys fees litigation costs and other damages as to be more particularly set forth herein.

2.     The FCA provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, submits or causes to be submitted a false or fraudulent claim to the United States Government for payment or approval is liable for a civil penalty of between $10,957.00, on the low end, and up to $21,916.00, on the high end for each claim,[1] plus three times the amount of the damages sustained because of the false claim. The FCA allows any persons having knowledge of a false or fraudulent claim against the United States to bring an action for themselves and for the United States, and to share in any recovery. The party bringing the action is known as a "Relator" and the action that a relator brings is called a *qui tam* action.

3.     Relators, Cynthia Walker and Jacqueline Hollins file this action on behalf of the United States pursuant to the *qui tam* provisions of the FCA, 31 USC §3730 (b) (1).

4.     At least during August and September of 2017, and in all likelihood much longer prior to that, Sorrel's Transportation, Inc. (STC), through its agents, Cedric Sorrels and Gloria Long, and MTM, Inc., through its agent Tanaka Knight, knowingly, systematically and illegally billed Medicaid through the state administrative agencies for transportation services that were never delivered.

---

[1] The Federal Civil Penalties Inflation Adjustment Act Improvement Act ("2015 Adjustment Act"), incorporated by reference in the False Claims Act, dramatically increased civil penalties assessed after August 1, 2016, for violations occurring after November 2, 2015.

5.    In addition, the defendants engaged in a scheme to utilize the names and credentials of former employees of the company, who had passed required drug tests, background tests, and other certification requirements in order to legally act as drivers, to falsify documentation to cover for drivers who were not certified.

6.    In furtherance of these fraudulent schemes, MTM, Inc., and STC, Inc. provided false certifications to the State of Mississippi, Department of Medicaid, as well as the United States Department of Health and Human Services that such transportation services had been delivered, and/or had been delivered by certified drivers, when, in fact, they had not.

7.    MTM, Inc. is one of the nation's largest transportation brokers for "non-emergency medical transportation" (NEMT) services for Medicaid and Medicare recipients (hereinafter referred to, collectively, as "passengers"). MTM delivers those transportation services through subcontractors such as STC.

8.    STC supplied vehicles and drivers to perform transportation services for Medicaid recipients arranged by defendant MTM. Mr. Sorrels, along with at least one of his drivers (Gloria Long) conspired with an individual employed in the Jackson, Mississippi office of MTM (Tanaka Knight) to falsify documentation so as to make it appear that rides were given to Medicaid recipients for medical appointments, and to make it appear as if properly certified drivers had provided those transportation services when in fact neither was true.

9.    When one of the Relators, Ms. Walker, a driver, attempted to report the fraud to Defendant MTM on what was represented to her and to the public as

3

an "anonymous" fraud hotline, her identity was discovered by MTM and she was terminated by STC. In addition, STC, suspecting that co-relator, Ms. Hollins, the office manager for STC, was likewise involved as a whistleblower, terminated Ms. Hollins.

10.    Throughout the relevant period, Defendants knowingly, or with willful blindness or reckless disregard for the truth, presented false claims for reimbursement of transportation services that had been delivered, and/or had been delivered by certified drivers, when, in fact, they had not. In addition, the Defendants retaliated, or conspired to retaliate, against plaintiffs Walker and Hollins, individually for attempting to report the fraud and blowing the whistle on the defendants' fraudulent conduct.

11.    Furthermore, after receiving notice of the discovery of the fraud by Relators, it is believed that defendants conducted internal investigations confirming the existence of the fraud, but failed to report the fraud to the appropriate federal and state officials, effectively engaging in multiple cover-ups of their own the fraudulent conduct.

### THE COURT'S JURISDICTION

12.    This Court has jurisdiction over the subject matter of this Complaint pursuant to the False Claims Act, 31 U.S.C. § 3729, et seq.; 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a). The Court has personal jurisdiction over the Defendants because the Defendants transact business within the United States District Court for the Northern District of Mississippi.

4

13.     Under the False Claims Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on the defendants until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information.

14.     This action is not based upon any public disclosure of information within the meaning of 31 U.S.C. § 3730(e)(4)(A). The Relators have direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), derived through their employment and/or contacts with Defendants, and their own investigations of the information on which the allegations set forth in this Complaint are based. Relators have voluntarily provided this information to the Government prior to filing the Original Complaint. To the extent any of these allegations may have been publicly disclosed, within the meaning of 31 U.S.C. § 3730(e)(4)(A), the Relators were the sources of the disclosures.

## THE PARTIES

15.     Relator, Cynthia Walker, a citizen of the United States and an adult resident of Greenville, Mississippi, is suing on behalf of and in the name of the United States of America and on behalf of herself personally. Mrs. Walker was employed as a driver for STC until her termination on September 11, 2017.

16.     Relator Jacqueline D. Hollins, also a citizen of the United States and an adult resident citizen of Greenville, Washington County, Mississippi, was employed as the office manager for STC until her termination on September 11,

2017. Ms. Hollins is also suing on behalf of and in the name of the United States of America and on behalf of herself personally.

17.     Defendant MTM, Inc. is a privately held corporation headquartered in Lake St. Louis, Missouri, who acts as a broker to coordinate and manage locally operated transportation services to provide transportation to and from non-emergency medical appointments for Medicaid recipients.  MTM has its nationwide call service, as well as its general state office, located in Jackson, Mississippi.  MTM, although doing business in Mississippi, is not registered to do business in Mississippi and has no locally registered agent for service of process. MTM may therefore be served by serving one or more of its officers at the home office in Lake St. Louis, Missouri.

18.     Defendant Cedric Sorrels is an adult resident citizen of Greenville, Washington County, Mississippi, who, as owner and operator of STC, supplied vehicles and drivers to perform transportation services for Medicaid recipients that were arranged by Defendant MTM.  Mr. Sorrels may be served with process at his principal place of business in Greenville, Mississippi.

19.     Sorrels Transportation, Inc., (STC) is a privately held Mississippi corporation headquartered in Greenville, Mississippi to provide transportation services to and from non-emergency medical appointments for Medicaid recipients.   STC may be served through its registered agent for service of process, Cedric Sorrels Sr., 630 Norris Street, Greenville, Mississippi.

20.     Gloria Long is an adult resident citizen of Greenville, Washington County, Mississippi.

6

21.    Tanaka Knight is believed to be an adult resident citizen of Brandon, Mississippi.

### THE NON-EMERGENCY MEDICAL TRANSPORT (NEMT) or (NET) PROCESS (AS IT SHOULD WORK)

22.    Medicaid is a government program for persons of all ages whose income and resources are insufficient to pay for health care. It is the largest source of funding for medical and health-related services for people with low income in the United States. It is a means-tested program that is jointly funded by the state and federal governments and managed by the states, with each state currently having broad leeway to determine who is eligible and for implementation of the program.

23.    Each state determines eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury. 42 CFR §§430.0 – 430.30 (1994). The federal share of Medicaid expenditures varies by state and can fluctuate annually.[2]

24.    As part of the benefits afforded to Medicaid recipients, the United States government will reimburse companies who furnish transportation to and from those recipients' non-emergency medical appointments. These transportations or trips are referred to in the industry as non-emergency medical transports, or "NEMT", and are referred to in the Mississippi Regulations

---

[2] This federal participation in the monies reimbursed to Medicaid recipients, either directly or indirectly, necessarily involves federal dollars - thus subjecting the perpetrators of any fraud on that system to the penalties and consequences imposed by the federal False Claims Act.

regarding Non-Emergency Transportation as "NET".[3]

25.    Under the Mississippi Regulations governing Medicaid non-emergency Transportation, the state of Mississippi may contract with a Broker to provide NET to Medicaid beneficiaries. The Broker is responsible for administering and operating the NET program in accordance with Medicaid policy, including ensuring that the drivers and the vehicles meet Medicaid minimum requirements.[4]

26.    The Broker must ensure that the drivers are properly licensed, pass random annual drug tests, pass criminal background checks, and are not convicted of two or more moving violations or accidents related to transportation provided under the NET program, or have a suspended or revoked drivers license for moving traffic violations in the previous five years.[5]

27.    MTM is one of the nation's largest transportation brokers who, working in conjunction with local transportation providers, such as STC, provides non-emergency medical transportation (NEMT) or (NET) to Medicaid recipients.

28.    According to MTM's website, the process should work as follows:

a.    A Medicaid passenger contacts MTM to request transportation for a medical appointment.

b.    The MTM system verifies the individual's eligibility and any special needs of the Medicaid recipient requesting transport.

c.    The MTM system then identifies proper routing directions and multi – loading opportunities.

---

[3] See the Code of Mississippi Administrative Rules, Title 23, Part 201 Chapter 2.
[4] Admin. Code, Title 23, Part 201, Chapter 2.1(B)
[5] Admin. Code, Title 23, Part 201, Chapter 2.6.

d.    The trip is then assigned and dispatched to a local transportation provider such as STC.

e.    The local transportation provider (STC) then picks up the Medicaid recipient requesting transport, at the agreed upon date and time, and takes them to the medical appointment, completing the trip. If the Medicaid recipient needs a ride home, then the process works the same in reverse.

f.    The local transportation provider then submits claims information online[6] to MTM.

g.    MTM then seeks reimbursement from Medicaid for the completed trip, collecting its brokerage fee and furnishing the local provider with its fees for the trip.

29.    As admitted on MTM's website, "MTM handles it all: recruiting, negotiations, contracting, credentialing, claims review, and payment processing. We hold our providers to high standards for customer service and safety, allowing our clients to rest assured that their members are in good hands."[7]

30.    With respect to the local transport provider, in this case, STC, the STC office would receive instructions from MTM prior to the date of requested transportation regarding:

a.    the identity of the passenger to be picked up;

b.    where that pick up was to occur;

---

[6] Instead of submitting the claims online, where they could be instantly verified, as will be shown hereafter, the claims from STC were hand delivered to one of the coconspirators in the parking lot of Big Lots across the street from the MTM offices in Jackson, Mississippi.
[7] See MTM website page attached hereto as Exhibit A.

        c.     where STC was to take the passenger; and

        d.     whether they were to bring that passenger back.

31.    Upon receiving that information, the dispatcher from STC would secure one of the STC vehicles and a driver to complete the trips.

32.    In order to provide the transportation services efficiently and to maximize the profits and minimize the costs associated with the trips, multiple passengers would be scheduled in each van.

33.    As stated earlier, the drivers in each of the vans are required to comply with the laws and regulations of the Mississippi Department of Medicaid regarding criminal background checks, random drug tests licensure, and minimum moving violations as specified in the regulations.

34.    Upon receiving the dispatches for the day, the driver, would drive the van on the route to pick up the passengers. Before taking any passenger anywhere, each passenger would be required to sign in on a transportation log, verifying the passenger's identity, and the location of the pick up.

35.    Once the van carrying the Medicaid passenger arrived at the medical appointment location, the first leg of the transportation had been completed. This was known as the "A" leg.

36.    Upon completion of the medical appointment, the transportation provider would pick up the passenger from the location where the medical services had been provided for the return trip home. Again, upon entering the vehicle, the passenger would sign the transportation log certifying that the second leg of the trip had been completed. This was referred to as the "B" leg.

37.    In some instances, the Medicaid passenger might not require a return trip, such as instances in which a relative or friend was coming back toward home, or the passenger chose to spend a longer time in the city where the medical appointment occurred. In those instances, there would be no return, or "B" leg for that passenger.

38.    The local transportation provider would then submit the paperwork to MTM via email, for MTM to file the claim for reimbursement from the state or federal government.

39.    Once the reimbursement funds had been received by MTM, then MTM would deduct its brokerage fees and furnish the remainder to the local transportation provider.

### THE FIRST PART OF THE SCHEME
### (RIDES THAT DID NOT OCCUR)

40.    Drivers, such as Cynthia Walker, were being paid by the hour.[8] The broker and the local transportation provider, on the other hand, were being paid by the trip.

41.    In July or August of 2017, Cynthia Walker, at the time a driver for STC, learned of an ongoing scheme to defraud the United States involving the owner of STC, Cedric Sorrels; at least one other driver, Gloria Long;[9] and the Mississippi Regional Director of MTM, Tanaka Knight.

---

[8] Due to the fact that the drivers were paid by the hour instead of by the trip, the drivers would have no apparent financial incentive to participate in the fraud. Therefore, it is believed that the drivers involved, as well as Tanaka Knight were receiving kickbacks.

[9] For reasons subsequently set forth, it is believed that many more drivers than just Gloria Long were involved in the fraud.

11

42. The scheme, in at least one of its simplest variations,[10] operated as follows:

    a.    The passenger would arrange for a pick up with MTM as normal, and the first portion of the trip, known as the "A" leg, would be completed with the passenger signing in and certifying that the "A" leg had been completed.

    b.    However, in certain instances in which it was known that there was to be no return or "B" leg for that particular passenger, the driver, Gloria Long, would nonetheless obtain signatures from that passenger at the completion of the "A" leg falsely certifying that the "B" leg had also been completed.

    c.    In other instances in which there had been no "B" leg, Gloria Long would simply go to the Medicaid passenger's home days following a medical visit and obtain signatures from that person again falsely certifying that the "B" leg had been completed.

    d.    Instead of forwarding the completed paperwork to MTM by email, Sorrels would ask that one of his drivers hand-carry one of the "golden envelopes" containing the required

---

[10] Since neither of the Relators, Walker nor Hollns, were participants in the fraudulent scheme, the actual extent of the fraud and the possibility of other variants of the fraud are suspected, but not verifiable by Relators.

paperwork for the week to Jackson.[11]  Sorrel's instructions to
the driver were that they were to contact him by phone once
the driver had arrived in Jackson.

e.    During that phone call, or in a return phone call shortly
thereafter, the driver would be instructed where and when to
meet the Mississippi Regional Director of MTM, Tanaka
Knight.  Often this meeting occurred in the parking lot of the
Big Lots, which was directly across the street from the MTM
offices.[12]

### THE SECOND PART OF THE SCHEME
### (USING UNCERTIFIED DRIVERS)

43.    Following the filing of the original complaint in this action, but prior
to any intervention by the Government, Relators learned through both a
telephone conversation with a previous employee, and a review of
documentation in the possession of the Relators, of an additional fraudulent
scheme undertaken by the defendants.

44.    In order to be properly qualified to be employed as a driver,
Medicaid regulations require that the drivers:

a.    pass a criminal background check;[13]

b.    pass annual random drug tests;[14]

c.    are not convicted of two or more moving violations or

---

[11] Among the drivers asked to hand-deliver the paperwork to Jackson was Relator, Cynthia Walker.

[12] Relators have subsequently learned that the original paperwork was never to go to Tanaka Knight, but instead was to go to someone under her.  It is believed that further manipulation of the records was conducted by Knight prior to being submitted to the government for payment.

[13] Admin. Code, Title 23, Part 201, Chapter 2.6(A).

[14] Admin. Code, Title 23, Part 201, Chapter 2.6(D)(1).

accidents related to transportation provided under the NET Broker Program;[15]

d.     is not convicted of any federal or state crime listed in Miss. Code Ann. Sec. 43-13-121;[16] and

d.     do not have a suspended or revoked driver's license for moving traffic violations in the previous five (5) years.[17]

45.     These requirements are *material*[18] to the government's decision as to whether the broker, such as MTM and/or the agent of the broker, STC, will be paid for the contracted services. In fact, Rule 2.1(B)(10) states that one of the primary purposes of the minimum requirements compliance regarding drivers is to ensure that those who do not meet the minimum requirements are denied payment of government funds.

46.     In August of 2017, Ms. Hollins, in her position of office manager, noticed that the roster of drivers submitted to MTM on the on-line MTM portal were drivers who no longer worked for STC. Ms. Hollins undertook, on her own initiative, to remove some of the names from the computer program of drivers who no longer worked for STC. These drivers had all been previously certified as having passed the minimum driver requirements.

47.     Shortly thereafter, Ms. Hollins was disciplined for cleaning up the roster of drivers, and was told that as a result of her independent actions, many trips had been disallowed for reimbursement. This could only occur if the names

---

[15] Admin. Code, Title 23, Part 201, Chapter 2.6(D)(2)(a).
[16] Admin. Code, Title 23, Part 201, Chapter 2.6(D)(2)(b).
[17] Admin. Code, Title 23, Part 201, Chapter 2.6(D)(3).
[18] See, *Universal Health Serv. v. United States ex rel: Escobar,* 136 S. Ct. 1989 (2016).

14

of drivers who no longer were employed by STC, were being fraudulently represented as being the driver who had performed the transportation services.

48.     This conclusion was supported when both Ms. Walker and Ms. Hollins were contacted by a former driver for STC and were told that her name had been fraudulently placed on transportation logs whose drivers were disqualified under the Medicaid Rules due to their failure to comply with the minimum driver requirements.

49.     At the height of the fraud, MTM, through STC, was claiming to have provided between 400 and 500 NEMTs per day.  It is believed that this fraud was extremely widespread throughout the system because even new employees at STC were being taught how to commit the fraud.

## THE "CONFIDENTIAL" FRAUD HOTLINE AND RESULTING RETALIATION AGAINST THE RELATORS

50.     Upon discovering the fraudulent scheme through talking with other co-workers, Cynthia Walker, utilizing what was represented to her and to the public to be a "confidential" fraud hotline operated by MTM, reported the fraud.[19] Ms. Walker refused to give her name or number, and was assured that the report would be confidential.  It is believed this phone call occurred some time in late August 2017.

51.     Sometime between the report of the fraud by Ms. Walker and September 10, 2017, Cedric Sorrels, Tanaka Knight, Gloria Long, and other employees of STC became aware of the existence of a whistleblower in their midst.

---

[19] In a further effort to conceal her identity, Ms. Walker used another person's cell phone to make the call.

52. Wrongly suspecting that the Whistleblower was the office manager, Ms. Hollins, on September 11, 2017, Gloria Long and other employees of STC accused her of being the whistleblower, and threatened her verbally and physically.[20]

53. Eventually, Mr. Sorrels, who had been out of the office, came back and told Ms. Hollins that, for her own safety, she should take a couple of days off.[21] Tellingly, Mr. Sorrels demanded that Ms. Hollins surrender her laptop and flash drive prior to her leaving for the day. Later that night Ms. Hollins learned that she had been terminated.[22]

54. The same day, September 11, 2017, was also Ms. Walker's last day at work. Ms. Walker's vacation began the following day, on September 12, 2017.

55. Sometime between September 11, 2017 and September 14, 2017, Tanaka Knight obtained the tape of the recorded "confidential" call made by Ms. Walker in Jackson[23] and brought it to Greenville, Mississippi, where, listening to the tape along with Cedric Sorrels and Gloria Long, they identified the voice of the whistleblower as belonging to Ms. Walker.

56. On September 14, 2017, Ms. Walker was terminated. She was informed of her termination by Gloria Long.

---

[20] During the time that Ms. Hollins was being both verbally and physically threatened by Long and other employees of STC, others in the office looked on, laughing. Ms. Hollins filed a police report complaining of the incident, and prepared a detailed document discussing it in great detail.
[21] None of the instigators of the ruckus were asked to go home.
[22] Ms. Hollins was told by the maintenance man, Fred Townsend.
[23] The Jackson Mississippi office of MTM just happens to be the national phone center of MTM.

## THE CONFESSION

57.     Sometime prior to Thanksgiving in 2017, Ms. Walker heard that Tanaka Knight had brought the tape to Greenville and that was how they had identified Ms. Walker as the whistleblower. In response, Ms. Walker called the MTM home office in Missouri to report that Ms. Knight and Mr. Sorrels had utilized the tape of the supposedly anonymous phone call to identify her as the whistleblower.

58.     Subsequent to the phone call to Missouri, but prior to November 27, 2017, Ms. Hollins received a phone call from Ryan Kasper, an officer at MTM. At that time, Ms. Hollins indicated that she had in her possession incriminating emails and text messages from Tanaka Knight, but would not show them to him until after she had spoken to counsel.[24]

59.     On Monday November 27, 2017, Ms. Hollins met with Mr. Kasper at the Whole Foods in Jackson, Mississippi, and showed Mr. Kasper the incriminating documentation that was in her possession. At that time, Ms. Hollins informed Mr. Kasper that he should meet with other former employees of STC.

60.     In response to this request, officials of MTM set up a meeting in Cleveland, Mississippi with the Relators, Ms. Walker and Ms. Hollins, as well as two other former employees of STC, Tasha Rogers and Shaujuan Barber. This meeting occurred on November 29, 2017.

61.     Present at the meeting on behalf of MTM were Ryan Kasper, from the Jackson, Mississippi office of MTM and another representative from the

---

[24] The counsel to whom Ms. Hollins was referring was neither of the undersigned, and does not represent Ms. Hollins in this action. That counsel gave permission for Ms. Hollins to show the requested emails and text messages to Mr. Kasper.

17

Missouri home office.[25]

62.    During the meeting, the representatives of MTM admitted the following:

   a.    Tanaka Knight was never supposed to get the original records regarding the NEMTs from STC.  They should have gone to someone who worked under Ms. Knight;

   b.    They had confirmed that Tanaka Knight had checked out the tape of the recorded anonymous phone call made by Ms. Walker that had been used to identify her as the whistleblower; and

   c.    They apologized to the ladies for being terminated.[26]

63.    Also at the meeting, one of the former STC employees, Tasha Rogers, supplied the MTM representatives with the names and addresses of several Medicaid recipients who were regular passengers of STC in the Cleveland area who had participated in the fraud.

## THE COVER-UP

64.    Subsequent to the meeting in Cleveland with representatives of MTM, Relators heard that Tanaka Knight had been terminated by MTM[27] and that STC had been suspended pending an investigation by MTM and Medicaid.

65.    After a period of only about one month (the month of December

---

[25] Neither Relator can remember this individual's name.  He was a white male, and his first name is believed to be either Brian or Bryant.

[26] Even though the representatives apologized to the former employees of STC for being terminated, no compensation was offered nor were promises nor representations made that they would try and get the terminated employees their jobs back.

[27] This termination was later confirmed by emails and/or text messages between Ms. Hollins and Ms. Knight.

2017) Relators received word in January 2018 from friends and former co-workers that the investigation had been concluded and that STC had been cleared by both MTM and the Mississippi Department of Medicaid of all wrongdoing, and that the suspension had been lifted.

66.    In fact, out of spite directed toward both Ms. Walker and Ms. Hollins, both were sent anonymous letters[28] in the mail, which consisted of a portion of a redacted single page email from some unnamed individual at MTM to Mr. Sorrels. The email states:

"Dear Mr. Sorrels,

MTM and DOM have concluded their investigation and have not found anything that would warrant continued suspension. Therefore, effective immediately, you are reactivated to new trips in our system.

Have a great weekend,"

67.    Neither Ms. Walker nor Ms. Hollins (nor anyone else to Relator's knowledge) had been questioned by the Mississippi Department of Medicaid; the Medicaid Fraud Control Unit (MFCU) of Mississippi; the United States Department of Health and Human Services; the FBI; or the United States Attorney's office prior to filing the Original Complaint.

68.    In addition, STC is back up and running at full speed. Both Cedric Sorrels and Gloria Long, who were directly named by the Relators and by the other former employees of STC present at the November 29 2017 meeting as having direct involvement in the fraudulent scheme are currently working full time

---

[28] The copy of the envelope and letter directed to Ms. Hollins is attached hereto collectively as Exhibit B. A copy of the envelope and letter directed to Ms. Walker is attached hereto collectively as Exhibit C.

at STC

69.     Thus Relators strongly believe that this fraud has been covered up,

and that none of the money wrongfully taken from the United States Treasury has

been returned.

## DAMAGES OF THE UNITED STATES
## UNDER THE FALSE CLAIMS ACT

70.     The FCA provides for the award of treble damages and civil

penalties for, *inter alia*, knowingly causing the submission of false or fraudulent

claims for payment to the United States, or knowingly using a false record or

statement material to get false claims paid by the United States, 31 USC §3729

(a)(1)(A), (B) and (C) (2009). The FCA provides that any person who:

> (A) knowingly presents, or causes to be presented, a false
> or fraudulent claim for payment or approval; [or]
> (B) knowingly makes, uses, or causes to be made or used a
> false record or statement material to a false or fraudulent
> claim; [or]
> (C) conspires to commit a violation of subparagraphs (A),
> (B), (D), (E), (F), or (G);
> .... Is liable to the United States government for a civil
> penalty of not less than $5,000 and not more than $10,000
> as adjusted by the Federal Civil Penalties Inflation
> Adjustment Act of 1990, [citation omitted] plus 3 times the
> amount of damages which the Government sustained
> because of the act of that person . . .
>
> .....
>
> (b) For the purposes of this section - -
> > (1) the terms "knowing" and "knowingly" --
> > > (A) mean that a person, with respect to
> > > information –
> > > > (i) has actual knowledge of the
> > > > information;
> > > > (ii) acts in deliberate ignorance of
> > > > the truth or falsity of the
> > > > information; or
> > > > (iii) acts in reckless disregard of

20

> the truth or falsity of the
> information; and
> (B) require no proof of specific intent to
> defraud.

31 USC §3729 (a), (b).

71.    There are four elements to a False Claims Act claim: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim."[29]

72.    Each of the four elements is clearly present in this cause of action:

a.    The first Element is satisfied. The false statement regarding NEMTs that never took place were concocted by the defendants and submitted for payment.

b.    The second element is satisfied. The parties engaged in the wrongful conduct clearly knew that they were committing fraud. In fact, they were teaching new employees how to do it, and retaliating against anyone they suspected was involved in blowing the whistle on the scheme.

c.    The third element is satisfied. Obviously the claims for the phantom NEMTs were material because the evidence of each trip was the basis of payment for the services rendered. Since both MTM and STC were paid on a per trip basis, falsifying the records so as to make it appear that more trips occurred than was actually the case was a

---

[29] *Abbot v. BP Exploration & Prod., Inc.*, 851 F. 3d 384, 387 (5th Cir. 2017).

21

material factor in determining how much was paid.

d.    The fourth element is satisfied. Again, since MTM and STC were paid based upon the number of NEMTs allegedly furnished, this caused the government to pay out more than it otherwise should have. Similarly, the failure to disclose the fraud, once discovered, resulted in the retention of funds to which neither MTM nor STC were entitled.

73.    In addition to treble damages for violation of the Act, each violation is subject to a civil penalty under Section 3729(a)(1) in a minimum amount of $10,781.00 per false claim to a maximum of $21,563.00 per false claim.

## VIOLATION OF THE FALSE CLAIMS ACT

### COUNT I: False or Fraudulent Claims

**Violation of the False Claims Act, 31 U.S.C. sec. 3729(a)(1)(A)**

74.    Brokers such as MTM and local transportation providers such as STC, who participate in the Medicaid program, submit for payment the claims for services rendered to recipients to designated agencies within the respective states. As this Complaint has demonstrated, both MTM and Sorrels (STC) and Long and Knight have repeatedly submitted and/or caused to be submitted false claims within the meaning of the statutes for NEMTs that never occurred.

75.    The Defendants knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, for NEMTs that never occurred.

76.    Alternatively, once the fraud was discovered, Defendants failed to

22

report the fraud and engaged in a scheme to cover up the fraud, resulting in the retention of funds to which they are not entitled.

77.    This conduct constitutes willful conduct on behalf of defendants in violation of the False Claims Act, 31 U.S.C. sec. 3729 *et seq.* in that each and every claim for a NEMT that never took place, constitutes a "False Claim" within the meaning of the Act.

78.    By virtue of the false or fraudulent claims presented or caused to be presented by the defendants, the United States has suffered damages.

79.    Defendants are liable to the United States for treble damages under the FCA in an amount to be determined at trial, plus a civil penalty of no less than $10,781.00 and no more than $21,563.00 for each false claim presented, or caused to be presented, by defendants.

### COUNT II: False Statements

### Violation of the False Claims Act 31 U.S.C. sec. 3729(a)(1)(B)

80.    Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. sec. 3729(a)(1)(B), as amended on May 20, 2009.

81.    Defendants are liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of no less than $10,781.00, and no more than $21,563.00 for each false claim presented or caused to be presented by defendants.

23

## COUNT III: Relator's Entitlement to Participation
## in United States' Recovery Pursuant to 31 U.S.C. sec. 3730(d)

82.     Cynthia Walker, and Jacqueline D. Hollins, former employees of STC, and the relators herein, voluntarily provided information of the false claims and their nature to the United States Attorney for the Northern District of Mississippi prior to the filing of this Complaint.

83.     This information was not publicly known prior to the revelation of the false claims by the relators herein.

84.     The relators also have furnished or will be furnishing documents and other material evidence to the United States Attorney regarding the false claims and misrepresentations made by the Defendants, including emails, text messages and other internal documentation.

85.     In addition, neither Relator participated in the fraudulent scheme perpetrated by the Defendants.

86.     Furthermore, this Complaint, prepared by counsel for the Relators with the assistance of the relators, examines the underlying fraud, yet at the same time, sets forth the false claims and their nature in a simple and straightforward manner, allowing the United States to quickly, thoroughly and efficiently investigate these false claims and prosecute this action, both in the state of Mississippi, and in the other states in which MTM operates.

87.     Finally, both Relators reported the fraud quickly upon discovery (they thought) to what they thought were the appropriate authorities so as to prevent further exploitation of the Government by the Defendants.

24

88.    Accordingly, the *Qui Tam* Plaintiffs, Relators herein, should be awarded the maximum amount allowed pursuant to section 3730(d) of the False Claims Act.

### COUNT IV: Relator's Entitlement to Damages
### For Retaliation Pursuant to 31 U.S.C. sec. 3729(h)

89.    Both Cynthia Walker and Jacqueline D. Hollins, in addition to the award damages available to them as Whistleblowers under the False Claims Act, also seek individual damages for the retaliation they suffered at the hands of the Defendants pursuant to 31 U.S.C.sec. 3729(h).

90.    As set forth above, both Cynthia Walker and Jacqueline Hollins were terminated and otherwise threatened, both physically and verbally, because they either participated as whistleblowers, or were suspected to have been whistleblowers.  Such conduct is actionable under the federal statutes.

91.    As a result of their termination by STC, both Relators have suffered economic damages as well as damages for harassment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America, *ex rel*: Cynthia Walker and Jacqueline D. Hollins, and Cynthia Walker and Jacqueline D. Hollins individually, request that judgment be entered in their favor and against Defendants as follows:

1.    That process be issued requiring the Defendants named herein to answer fully the allegations contained in this complaint;

2.    That on the First and Second Counts under the False Claims Act for the amount of the United States damages, trebled as required

25

by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

3. On the Third Count, that the *qui tam* Plaintiffs/Relators be awarded the maximum amount allowed pursuant to section 3730(d) of the Federal Civil False Claims Act;

4. On the Fourth Count that the qui tam Plaintiffs/Relators be awarded damages for retaliation as permitted by section 3729(h) of the federal Civil False Claims Act;

5. With respect to each count, interest, attorney's fees and costs as allowed by law and any and all further relief as the Court deems just and proper.

9. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States of America, *ex rel*: Cynthia Walker and Jacqueline D. Hollins, and Cynthia Walker and Jacqueline D. Hollins, as Relators and individually, hereby demand trial by jury.

**RESPECTFULLY SUBMITTED** this the 25th day of January, 2018.

UNITED STATES OF AMERICA, *ex rel:*
CYNTHIA WALKER and JACQUELINE D.
HOLLINS

Cynthia Walker, Relator

Jacqueline D. Hollins, Relator

26

**OF COUNSEL:**

C. W. Walker III MSB# 6870
C. W. Walker III, LLC
512 Main Street
Greenville, MS 38702-0841
Phone: 662.820.0070
Email: bill@bill-walker.com
MSB# 6870


Gaines S. Dyer MSB #6255
J. Peirce Beach MSB #104498
Dyer, Dyer, Jones and Daniels
P. O. Box 560
Greenville, MS 38702-0560
Telephone (662) 378-2626
Email address:
    gsdyer@suddenlinkmail.com
    Jpbeach@outlook.com


**STATE OF MISSISSIPPI**
**COUNTY OF WASHINGTON**

**PERSONALLY CAME AND APPEARED BEFORE ME,** the undersigned authority in and for the jurisdiction aforesaid, the within named Cynthia Walker, who stated on her oath that the facts and matters contained in the above and foregoing document are true and correct as therein stated, and that with respect to those stated on information and belief, the undersigned Cynthia Walker verily believes such representations to be true and correct as stated herein.

**SWORN TO AND SUBSCRIBED BEFORE ME** on this the 3rd day of _____, 2018.

_____
Notary Public

My Commission Expires:

_____

LACEY E. WEST
ID # 91735
Commission Expires
March 15, 2022

27

**STATE OF MISSISSIPPI**
**COUNTY OF WASHINGTON**

     **PERSONALLY CAME AND APPEARED BEFORE ME,** the undersigned authority in and for the jurisdiction aforesaid, the within named Jacqueline D. Hollins, who stated on her oath that the facts and matters contained in the above and foregoing document are true and correct as therein stated, and that with respect to those stated on information and belief, the undersigned Jacqueline D. Hollins verily believes such representations to be true and correct as stated herein.

     **SWORN TO AND SUBSCRIBED BEFORE ME** on this the 3ʳᵈ day of ____May____, 2018.

_____
Notary Public

My Commission Expires:

4-17-22

## Network Management

Managing the complex and dynamic needs of a transportation network can be daunting. MTM has experience to quickly and efficiently build networks in new locations.



MTM handles it all: recruiting, negotiations, contracting, credentialing, claims review, and payment processing. We hold our providers to high standards for customer service and safety, allowing our clients to rest assured that their members are in good hands.

## Cost Savings

With reduced funding and a rising demand for transportation, MTM helps clients do more with less, lowering NEMT costs by up to 25% for previously unmanaged programs.

By negotiating fair rates with transportation providers, ensuring the most cost-effective modes of transportation, utilizing volunteer drivers, reducing fraud, and deploying other best practices, MTM introduces efficiencies to help clients make the most of their transportation dollars and protect federal funding.

## Technology

Technology is the heart of MTM's operations, enabling automation, protocol adherence, error reduction, and instant access to data. Proprietary, customized software drives MTM.

Our state-of-the-art phone system links our customer service centers, preventing down-time and allowing calls to be routed based on capacity and call volume. Additionally, online portals give clients, transportation providers, medical facilities, and members convenient access to trip scheduling, resources, and reports at any time of the day.

## Customer Service

Each year, MTM's customer service centers handle more than eight million calls while maintaining industry-leading customer satisfaction rates exceeding 95%.



Our contact centers also exceed National Committee for Quality Assurance (NCQA) standards for speed to answer and abandonment rates, and provide multilingual services to ensure members reach a friendly, helpful representative 24 hours a day, 7 days a week, 365 days a year.



PLAINTIFF'S EXHIBIT

A

Jackie D. Hollins
319 Adrian Dr.
G'ville, MS 38701



JACKSON MS 390

12 MAY 2018 PM 3 L



PLAINTIFF'S
EXHIBIT
B

Dear Mr. Sorrels,

MTM and DOM have concluded their investigation and have not found anything that would warrant continued suspension. Therefore, effective immediately, you are reactivated to new trips in our system.

Have a great weekend,



Confidentiality Notice: The information contained in this electronic transmission is privileged and confidential intended for the use of the addressee listed. The authorized recipient of this information is prohibited from disclosing this information to any other party without the sender's permission, and is required to destroy the information after its stated need has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is strictly prohibited (Federal Regulation 42 CFR, Part 2, and 45 CFR, Part 160). If you have received this information in error, please notify the sender or call 1-888-561-8747 to arrange for return of these documents.

©1997-2011 Openwave Systems Inc. All rights reserved.

38703-660508

Cynitha Walker
1608 Causey Dr.
B'ville, MS. 38701

JACKSON MS 390

12 JAN 2018. PM 3 L

PLAINTIFF'S
EXHIBIT
C

Dear Mr. Sorrels,

MTM and DOM have concluded their investigation and have not found anything that would warrant continued suspension. Therefore, effective immediately, you are reactivated to new trips in our system.

Have a great weekend,



Confidentiality Notice: The information contained in this electronic transmission is privileged and confidential Intended for the use of the addressee listed. The authorized recipient of this information is prohibited from disclosing this information to any other party without the sender's permission, and is required to destroy the information after its stated need has been fulfilled. If you are not the intended recipient, you are hereby notifie that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is strictly prohibited (Federal Regulation 42 CFR, Part 2, and 45 CFR, Part 160). If you have received this information in error, please notify the sender or call 1-888-561-8747 to arrange for return of these documents

©1997-2011 Openwave Systems Inc. All rights rese